UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | CRIM. NO. 95-10355-RCL |
| RICHARD J. GEORGE<br>        Defendant | ) ) ) ) | |

# MEMORANDUM OF LAW SUPPORTING
# THE PETITION OF RICHARD J. GEORGE FOR
# WRIT OF ERROR CORAM NOBIS

Petitioner Richard J. George submits this memorandum of law in support of his second petition for writ of error coram nobis.

## BACKGROUND

On December 15, 1995, petitioner appeared before the court, Lindsay, J., to waive indictment and plead guilty to a one count information charging a conspiracy to commit wire fraud in violation of 18 U.S.C. § 317, in the matter of <u>United States v. Richard J. George</u>, No. 95-10355-RCL.  The government alleged that petitioner, while employed as an assistant clerk-magistrate in the Cambridge District Court, provided blank search warrant forms to an individual who had no legitimate use for such forms, thereby depriving his employer, the Commonwealth of Massachusetts, of his (George's) honest services.

At petitioner's plea hearing, the Assistant U.S. Attorney described the alleged scheme as follows:

> With respect to the scheme, Your Honor, the government's evidence would show that beginning in approximately 1991, Fosher, Corso, DeVito, and Chinn engaged in a series of home invasions and robberies in Massachusetts and elsewhere. On occasion they targeted the homes of persons they believed to be drug dealers so as to minimize the likelihood that their victims would report the crime. In addition, they sought to steal drugs for their own use and for distribution to others.
>
> When they invaded, robbed such houses, they typically pretended to be police officers or law enforcement agents executing a search. On some occasions, they simply advised the victims that they had a warrant or implied that a piece of paper was a warrant.
>
> On two occasions, Your Honor, once in the early 1990's and once in January of 1995, the defendant, Richard George, gave blank warrant forms to Mr. Fosher, knowing that Fosher had no legitimate reason to have such forms. Mr. George did not disclose to the Commonwealth that he had given blank warrant forms to Mr. Fosher.
>
> In giving such forms to Mr. Fosher and in failing to disclose to his employer, the Commonwealth, that he had done so, Mr. George knew that he was engaging in a scheme to defraud the Commonwealth of its right to his honest services as First Assistant/Clerk Magistrate.
>
> The government's evidence finally would show, Your Honor, that in execution of this scheme and in furtherance thereof, Mr. Fosher placed the telephone call to Mr. George which is referenced in Paragraph 9 of the Information, that is, he telephoned Mr. George from Pompano Beach, Florida, on or about April 6, 1993.

(Tr. I-27/23) [1]

In its Rule 11 colloquy, the court advised petitioner of the third element of the offense that the government was required to prove:

> And third, that at some time during the life of the conspiracy agreement or understanding, you knew the purpose of the conspiracy agreement or understanding, and then deliberately joined the conspiracy…

---

[1] The transcript of the December 14, 1995 plea hearing (identified as Tr. I) and of the January 29, 1996 sentencing hearing (identified as Tr. II) will be cited by page and line as "(Tr. I – p/l)." Both transcripts are appended to petitioner's affidavit as Exhibits B and C respectively.

2

(Tr. I-26/3  Following the colloquy, the Assistant U.S. Attorney outlined the government's evidence.  In relevant part, the AUSA stated:

> In giving such forms to Mr. Fosher and in failing to disclose to his employer, the Commonwealth, that he had done so, Mr. George knew that he was engaging in a scheme to defraud the Commonwealth of his honest services as First Assistant/Clerk Magistrate.

(Tr. I-29/19)

Having found that petitioner had entered his guilty plea competently, with full awareness of the charges and consequences of the plea, and that the plea was knowing and voluntary, and that the plea was "supported by an independent basis of fact contained in each of the essential elements of the offense charged," (Tr. I-30/17) the court accepted the plea and found petitioner guilty.

On January 29, 1996, petitioner appeared before the court for sentencing.

The court indicated that it was aware of the government's inability to prove that petitioner knew what the search warrants would be used for:

> THE COURT:  And let me just finish this.  And a critical question pertaining to Mr. George's culpability whether he do – what it is these warrants are going to be used for and at this point, no one ever is satisfied with, the government cannot prove that he knew that these warrants were going to be used for some unlawful purpose.

(Tr. II-8/12)

The AUSA conceded the problem created by the petitioner's lack of knowledge regarding use of the search warrants:

> First, that absent the acceptance of the plea, we do not believe that Mr. George, who has admitted that he committed this crime which he has been charged, would be able to be prosecuted.  We do not believe that we could prosecute him without his guilty plea, either now or realistically at any time in the future.

(Tr. II-16/11)

The court acknowledged the government's problem of proof:

3

>THE COURT: Well, all right. You are saying to me that you
>don't think you can prosecute him for this, for the crime which
>he is charged in this indictment and with respect to information
>that he may be able to give, but others, you wouldn't be able
>to get that. You don't know if you are going to get that
>information in any event come Monday morning or whenever
>the trial is going to be. He may stiff you Monday morning about
>this information, but you tell me you can't prosecute him anyway;
>is that right?

(Tr. II-17/9)

And the AUSA confirmed the court's understanding: "That is correct, Your Honor." (Tr. II-17/19). At no time did the government argue that petitioner had requested or received a kickback or bribe from Fosher, or anyone else named or unnamed in the Information, in exchange for providing the blank search warrant forms. The Information (EXHIBIT A to Affidavit of Richard George in Support of Petition for Writ of Error Coram Nobis) contained no such allegation.

Despite the government's concession that it would not be able to prove that petitioner knew what the search warrants would be used for, and despite their acknowledgement that they would not be able to prosecute the petitioner without his guilty plea, and although the court indicated that it was aware of the government's lack of evidence regarding petitioner's knowledge, the court nevertheless proceeded to impose sentence. Petitioner was sentenced to a committed sentence of 20 months, probation of 2 years, 200 hours community service, a $10,000 fine, and a $50 mandatory assessment. Petitioner self-surrendered at the federal prison facility at Schuykill, Pennsylvania on February 20, 1996 to commence his sentence. He remained at the facility at Schuykill, Pennsylvania until his transfer to a halfway house in Boston on April 23, 1997. He reported to the U.S. Probation Officer on April 24, 1997, and completed his two year term of supervised release on April 23, 1999.

Petitioner filed his first Petition for Writ of Error Coram Nobis on October 29, 2004. The court denied the petition without hearing on June 16, 2006. Upon appeal, the Court of Appeals summarily affirmed in an unpublished judgment. (No. 06-2010; May 11, 2007)

## ARGUMENT

**THERE WAS AN INSUFFICIENT FACTUAL AND LEGAL BASIS FOR PETITIONER'S GUILTY PLEA, WHICH CONSTITUTES FUNDAMENTAL ERROR ENTITLING HIM TO CORAM NOBIS RELIEF**

### Availability of Coram Nobis Relief

Pursuant to the All Writs Act, 28 U.S.C. § 1651(a), a district court is authorized to grant the common law writ of error coram nobis. ("The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions agreeable to the usages and principles of law."); United States v. Morgan, 346 U.S. 502, 511 (1954) (holding that the enactment of 28 U.S.C. § 2255 did not supersede the availability of writ of coram nobis). The writ is available as a "remedy of last resort for petitioners who are no longer in custody pursuant to a criminal conviction and therefore cannot pursue direct review or collateral relief by means of a writ of habeas corpus." Fleming v. United States, 146 F.3d 88, 89-90 (2d Cir. 1998) The court is authorized to grant the writ, however, only "under circumstances compelling such action to achieve justice." Morgan, supra, 346 U.S. at 511. The writ is issued "to correct errors of fact unknown to the court at the time of the judgment, without fault of the defendant, which, if known, would probably have prevented the judgment." Id., 346 U.S. at 516.

In deciding whether to grant the writ, courts have used a three-part test: a petitioner must 1) explain his failure to seek relief from judgment earlier; 2) demonstrate continuing collateral

consequences from the conviction; and 3) prove that the error is fundamental to the validity of the judgment. See United States v. Sawyer (Sawyer II), 239 F.3d 31, 38 (1st Cir. 2001); United States v. Barrett, 178 F.3d 34, 56, n. 20 (1st Cir.1999); United States v. Hager, 993 F.2d 4, 5 (1st Cir. 1993); see also United States v. Mandanici, 205 F.3d 519, 524 (2d Cir. 2000). In Sawyer II, the court assumed, without deciding, that coram nobis was available to vacate a criminal conviction premised upon a fundamental error of law. 239 F.3d at 38.

### A.     Petitioner's Failure to Seek Relief from Judgment Earlier

Prior to pleading guilty, petitioner had retired on September 25, 1995, from his position as an assistant clerk-magistrate of the Cambridge District Court. His monthly retirement benefit of $1,424.91 commenced October 1, 1995 and continued without interruption until petitioner was notified by the State Board of Retirement in January, 2003, that his benefits were being suspended as of January 1, 2003, as a result of his federal conviction, pending a hearing before the State Board of Retirement. Said hearing had initially been deferred at petitioner's request pending the issuance of the decision by the Second Circuit Court of Appeals in United States v. Rybicki, Nos. 00-1043, 00-1044, 00-1052, 00-1055, and the hearing remained deferred pending the adjudication of the first coram nobis petition.

Following the affirmance of the court's denial of the first petition by the Court of Appeals on May 11, 2007, the State Board of Retirement held a hearing, after which, on February 28, 2008, it revoked Petitioner's pension.

The reasons for the delay in filing the first coram nobis petition are set forth in Memorandum of Points and Authorities in Support of Motion for Write of Error Coram Nobis, filed in support of the first petition. It is submitted that petitioner originally sought coram nobis relief in a timely manner in view of the circumstances surrounding his pension. The instant

petition is being timely submitted as a result of the recent decision of the Supreme Court in Skilling v. United States, 561 U.S. ___ , 130 S.Ct. 2896 (2010)

It is submitted that petitioner has shown "sound reasons" for his delay in seeking coram nobis relief. Morgan, supra, 74 S.Ct. at 253, (requiring "sound reasons" for a petitioner's "failure to seek appropriate earlier relief"); Telink, Inc. v. United States, 24 F.3d 42, 47 (9th Cir. 1994) ("In requiring reasonable diligence at all times, our holding ensures a petitioner will not use an analogous limitations period as a safe haven for prejudicing the government, willfully delaying the assertion of his or her rights and then raising the claim after the inexcusable delay has impaired the government's ability to respond to the allegations or to proceed to retrial."); United States v. Darnell, 716 F2d. 479, 481, n. 5 (7th Cir. 1983) ("The doctrine of laches adequately protects against 'sandbagging' and ensures that coram nobis relief will not be granted where a petitioner's inexcusable delay in raising his claim has prejudiced the government."). Beyond the usual consequences of being a convicted felon, significant additional collateral consequences of petitioner's conviction did not emerge until the suspension of his pension benefits on January 1, 2003.

      B.      **<u>Continuing Collateral Consequences from the Conviction</u>**

As noted above, petitioner continued to receive his Trial Court pension during the course of his incarceration, after he was released from custody, and up until January 1, 2003, when he was notified that his pension benefits were being suspended as a result of his federal conviction. Those benefits were revoked by the State Board of Retirement on February 28, 2008 and remain revoked to this day.

A petitioner seeking coram nobis relief must make a showing that he continues to suffer "significant collateral consequences" from the judgment. Hager v. United States, 993 F.2d 4, 5 (1st Cir. 1993). It will not be presumed "that the collateral consequences of a prior conviction

7

are sufficiently substantial to demonstrate the 'compelling circumstances' that warrant coram nobis relief." United States v. Dyer, 136 F.3d 417, 429 (5th Cir. 1998)

One court has described the collateral consequences requirement of coram nobis as follows:

> Considering . . . systemic interests in finality, we have rejected coram nobis petitions except where there is a concrete threat that an erroneous conviction's lingering disabilities will cause serious harm to the petitioner. Thus, the types of disabilities sufficient to justify coram nobis relief can be broken down into three elements. First, the disability must be causing a present harm; it is not enough to raise purely speculative harms or harms that occurred completely in the past. Second, the disability must arise out of the erroneous conviction. Third, the potential harm to the petitioner must be more than incidental.

United States v. Craig, 907 F.2d 653, 658 (7th Cir. 1990), *cert. denied* 500 U.S. 917 (1991) (footnote omitted). That court has also referred to collateral consequences as "lingering civil disabilities." Id. at 657. See United States v. Keane, 852 F.2d 199, 203 (7th Cir. 1988) (identifying disabilities that are "unique to criminal convictions," such as loss of the rights to vote, hold occupational licenses, and bear arms). See also Tapia Garcia v. INS, 237 F.3d 1216, 1218 (10th Cir. 2001) (alien's "inability to reenter and reside legally in the United States with his family is a collateral consequence of his deportation because it is clearly a concrete disadvantage imposed as a matter of law"); Leitao v. Reno, 311 F.3d 453, 456 (1st Cir. 2002) (same); United States v. Foont, 901 F.Supp. 729, 734 (S.D.N.Y. 1995) (a statute which bars defendant from reentering his profession presents just the kind of continuing legal consequence that justifies allowing a defendant to properly move a court to issue a coram nobis writ); United States v. Osser, 864 F.2d 1056, 1060 (3rd Cir. 1988) (assuming, without deciding, that loss of pension is a cognizable collateral consequence for coram nobis relief). Clearly, the loss of pension benefits as a result of the instant conviction is within the category of "significant collateral consequences."

8

### C. Error Fundamental to the Validity of the Judgment

The wire fraud statute assigns penalties to anyone who,

> having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . communication in interstate or foreign commerce, any writings . . .or sounds for the purpose of executing such scheme or artifice. . .

18 U.S.C. § 1343. An essential element of this crime is intent to defraud. The Government must prove that the defendant engaged or participated in a fraudulent scheme with an understanding of its fraudulent or deceptive character and with an intention to be involved in the scheme and to help it succeed with a purpose of causing actual financial harm to another. United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999).

In 1987 the Supreme Court held, in McNally v. United States, 483 U.S. 350, 359 (1987) that the mail fraud statute did not prohibit schemes to defraud citizens of their intangible, non-property right to honest and impartial government. In response to this decision, Congress enacted 18 U.S.C. § 1346, which provides that, for the purpose of, *inter alia*, the mail and wire fraud statutes, "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."

Over time, the "honest services" doctrine became applicable to four general categories of defendants: 1) government officials who defraud the public of their own honest services; 2) elected officials and campaign workers who falsify votes and thereby defraud the electorate of the right to an honest election; 3) private actors who abuse fiduciary duties by, for example, taking bribes; and 4) private actors who defraud others of certain intangible rights, such as privacy. Id., 483 U.S. at 362-364 n. 1-4 (Stevens, J., dissenting) (surveying the pre-McNally scope of the doctrine). "Within these four categories, the doctrine grew in an 'uneven' way, case-by-case and circuit-by-circuit; and court after court warned of prosecutorial abuse." United

States v. Handakas, 286 F.3d 92, 102 (2nd Cir. 2002) (collecting cases).  See Geraldine Szott Moohr, Mail Fraud and the Intangible Rights Doctrine: Someone to Watch Over Us, 31 Harvard J. on Legis. 153, 179 (1994) ("[I]ncremental progression . . . of the intangible rights doctrine . . . is an excellent example of judicial crime creation.  [P]rosecutors . . . bring previously undefined conduct to trial in the hope that the court will criminalize it.")

While there was not unanimity among the circuits as to whether § 1346 restored pre-McNally case law, the First Circuit "recognized that Section 1346 was intended to overturn McNally and reinstate the reasoning of pre-McNally case law holding that the mail fraud statute reached schemes to defraud individuals of the intangible right to honest services of government officials." United States v. Sawyer, 85 F.3d 713, 724 (1996) (Sawyer I).

Many courts and commentators have acknowledged the ambiguity of § 1346's single sentence.  The First Circuit has said:

> The concept of governmental 'honest services' in this context eludes easy definition.  As Judge Winter has aptly noted: One searches in vain for even the vaguest contours of the legal obligations created beyond the obligation to conduct governmental affairs 'honestly' or 'impartially,' to ensure one's 'honest and faithful participation' in government and to obey 'accepted standards of moral uprightness, fundamental honesty, fair play and right dealing'. . . (citation omitted) [T]he quest for legal standards is not furthered by reference to 'the right to good government' and the duty 'to act in a disinterested manner.'

Id.  See Thomas M. DiBiagio, Politics and the Criminal Process: Federal Public Corruption Prosecutions of Popular Public Officials Under the Honest Services Component of the Mail and Wire Fraud Statutes, 105 Dickinson L. Rev. 57, 63  (2000) ("There are few areas of federal criminal law as ambiguous as the criteria for prosecution under Section 1346").

In United States v. Walters, 997 F.2d 1219 (7th Cir. 1993), the court asked the prosecutor at oral argument whether the following practical joke could constitute mail fraud:

> *A* mails *B* an invitation to a surprise party for their mutual friend *C. B* drives his car to the place named in the invitation. But there is no

> party; the address is a vacant lot; **B** is the butt of a joke. The invitation came by post; the cost of gasoline means that **B** is out of pocket.

Id. at 1224. The prosecutor responded that this indeed constituted mail fraud but that his office "pledges to use prosecutorial discretion wisely." Id. The court observed that "the idea that practical jokes are federal felonies would make a joke of the Supreme Court's assurance that § 1341 does not cover the waterfront of deceit." Id.

> To be free of tyranny in a free country, the causeway's edges[2] must be clearly marked. The exercise of federal government power to criminalize conduct and thereby to coerce and to deprive persons, by government action, of their liberty, reputation and property must be watched carefully in a country that values the liberties of its private citizens. Never can we allow federal prosecutors to make up the law as they go along.

United States v. Brown, 79 F.3d 1550, 1562 (11th Cir. 1996).

In further briefing ordered by the court on the first petition for writ of error coram nobis, petitioner argued that since petitioner's conviction in January, 1996, four First Circuit cases had further defined, and substantially limited, the reach of honest services fraud, and that the court should consider those cases in deciding the petition. In declining to apply those cases to petitioner's circumstances, the court held that "the cases are not applicable to the current matter, because a subsequent change in the law is relevant in post-conviction proceedings only if the change has been announced by the Supreme Court of the United States in a decision that is retrospectively applicable." (citations omitted) United States v. George, 436 F.Supp.2d 274, 278, n. 3 (D.Mass. 2006)

On June 24, 2010, the Supreme Court announced a change in the law, narrowing the reach of 18 U.S.C. § 1346 and holding that the statute "criminalizes *only* the bribe and kickback core of the pre-McNally case law." Skilling, supra, 130 S.Ct. at 2931 (emphasis in original).

---

[2] "The law is a causeway upon which, so long as he keeps to it, a citizen may walk safely." Robert Bolt, "A Man For All Seasons" Act II, 89 (Vintage 1960) (speech of Sir Thomas More). United States v. Brown, 79 F.3d 1550, 1562 (11th Cir. 1996)

11

Petitioner is entitled to the benefit of that construction inasmuch as it involves the meaning of a criminal statute enacted by Congress.  Bousley v. United States, 523 U.S. 614, 620 (1998). "[D]ecisions of [the Supreme Court] holding that a substantive federal criminal statute does not reach certain conduct, like decisions placing conduct 'beyond the power of the criminal law-making authority to proscribe,' (citations omitted) necessarily carry a significant risk that a defendant stands convicted of 'an act that the law does not make criminal.'"  Id.  "A judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction."  Rivers v. Roadway Express, Inc., 511 U.S. 298, 312-313 (1994).

It is indisputable that the government did not allege or offer evidence that the petitioner requested, was offered, or received a bribe or kickback as part of the alleged scheme to defraud the Commonwealth of his honest services.  (See EXHIBITS A, B and C to Affidavit of Richard J. George in Support of Petition for Writ of Error Coram Nobis)  "[N]o other misconduct falls within §1346's province."  Skilling, supra, 130 S.Ct. at 2933.  Petitioner's conviction and punishment were "for an act the law does not make criminal.  There can be no doubt that such a circumstance inherently results in a complete miscarriage of justice…"  Davis v. United States, 417 U.S. 333, 346-347 (1974).  "[A] district court is without jurisdiction to accept a guilty plea to a 'non-offense.'"  United States v. Rosa-Ortiz, 348 F.3d 33, 36 (1st Cir. 2003), citing United States v. Peter, 310 F.3d 709, 713 (11th Cir. 2002).

### REQUEST FOR HEARING

It is submitted that the foregoing points and authorities demonstrate that George's petition and affidavit make out a prima facie case for coram nobis relief.  The question then becomes whether the court should conduct a hearing on the petition.  In determining procedures

12

to apply in coram nobis proceedings, courts have analogized to habeas corpus petitions. See United States v. Balistrieri, 606 F.2d 216, 220-21 (7th Cir. 1979), *cert. denied*, 446 U.S. 917 (1980). "Whether a hearing is required on a coram nobis motion should be resolved in the same manner as habeas corpus petitions." Owensby v. United States, 353 F.2d 412, 417 (10th Cir. 1965), *cert. denied*, 383 U.S. 962 (1966). As in habeas corpus petitions, petitioner should be granted a hearing unless "motions and the files and records of the case conclusively show that the prisoner is entitled to no relief." United States v. Taylor, 648 F.2d 565, 573 (9th Cir. 1981), *cert. denied* 454 U.S. 866 (1981) (holding that whether a hearing is required on a coram nobis motion should be resolved in the same manner as habeas corpus petitions).

> [A] § 2255 motion may be denied without a hearing as to those allegations which, if accepted as true, entitle the movant to no relief, or which need not be accepted as true because they state conclusions instead of facts, contradict the record, or are inherently incredible.

United States v. McGill, 11 F.3d 223, 226 (1st Cir. 1993). Petitioner has raised serious, substantive issues concerning his guilty plea which are supported by the record and which merit a hearing.

## **CONCLUSION**

For the foregoing reasons, petitioner submits that he has made out a prima facie case for coram nobis relief and requests that the court set a time for a response by the United States, allow the petitioner to reply to that response within twenty days, and then either grant a hearing on the petition or grant the petition on the pleadings and vacate petitioner's conviction and dismiss the Information.

Dated: January 18, 2011                                   Respectfully submitted,

                                                          RICHARD J. GEORGE

                                                          By his attorney,

                                                          /s/ *Bruce T. Macdonald*
                                                          Bruce T. Macdonald
                                                          649 Massachusetts Avenue
                                                          Suite 8
                                                          Cambridge, MA 02139
                                                          (617) 354-1711
                                                          BBO #310400